UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KEENAN JERMAINE DUNIGAN,

    Defendant.
_____/

Case No. 1:20-cr-29-01

Hon. Hala Y. Jarbou

## OPINION

Defendant Keenan Dunigan is an inmate at a federal prison. He filed a motion under 28 U.S.C. § 2255 to vacate his May 2021 sentence, arguing that 1) his sentencing was improper because the death-results sentencing enhancement applied to him should have been submitted to and found by a jury, 2) he was never informed of the meaning and implications of the term "conspiracy" as it applied to the crime he pled guilty to, and 3) that there was insufficient probable cause to obtain a search warrant of a residence in which evidence the Government used against him was collected. Although he does not explicitly state it as a ground for relief, he argues that his appellate counsel was ineffective for failing to raise these issues on appeal. For the following reasons, the Court will deny Dunigan's motion.

### I. BACKGROUND

On January 13, 2021, Dunigan pled guilty to one count of distribution of fentanyl resulting in death for his role as the leader of a drug dealing operation in Kalamazoo. His three co-defendants also pled guilty in the days prior to Dunigan's own plea. The following information comes from the final presentence investigation report ("PSR"). In September 2019, Kalamazoo police used a confidential informant ("CS1") to initiate a drug deal with Dunigan. CS1 arranged

to purchase $60 worth of what was purported to be heroin, which he picked up at Dunigan's niece's home, where Dunigan was residing at the time. (PSR ¶ 25, ECF No. 156.) A Michigan State Police ("MSP") laboratory later tested the substance CS1 bought and determined that it contained a mixture of heroin and fentanyl. (*Id.*)

Days later, Kalamazoo police executed a search warrant at the home. During the course of their search, they identified clothing and personal effects belonging to Dunigan in one of the bedrooms, including a sweatshirt later identified as one Dunigan was wearing in a photo posted to his Facebook page. The sweatshirt was also newly dry-cleaned and still had a laundry tag with Dunigan's name attached to it. (*Id.* ¶ 26.) In the pocket of the sweatshirt, police discovered a sandwich bag containing a substance that was later revealed to be a 45.35-gram mixture of heroin and fentanyl. (*Id.*) In the closet of the same bedroom, police also found a stolen 9mm pistol and $8,255 in cash. (*Id.* ¶ 27.) The $60 that CS1 had given Dunigan in exchange for the previously purchased heroin/fentanyl mixture was identified in the money collected at the scene. (*Id.* ¶ 28.) Dunigan was subsequently charged with possession and distribution in state court and released on bond.

Prior to this activity, in December 2019, after being released from custody, he moved in with Jennifer Davis, his girlfriend and co-defendant in Battle Creek. While living with Davis, investigators determined that he continued to deal drugs, this time from her home. (*Id.* ¶ 29.) In January 2020, he moved out of Davis's home and into the residence of his other two co-defendants, Edmonds and Singleton. (*Id.* ¶ 30.)

After the move, phone records from January 13, 2020, revealed that Dunigan texted Davis what appeared to be a picture of a large quantity of heroin in a plastic bag, as well as the statement, "I'm broke now I just re up I bought a quarter brick." (*Id.* ¶ 31.) A "quarter brick" refers to 250

grams of heroin.  Shortly after texting Davis, Dunigan texted a contact in his phone, "Megan," asking, "Wyd why u ain't call me. Today I got fire."  "Fire" refers to drugs.  He further arranged to sell $20 worth of heroin to a client, "Jessica," and arranged to meet her at a public place near Edmonds' and Singletons' residence.  (*Id.* ¶ 32.)

The next morning, at 1:46 a.m. on January 14, Dunigan received a text from the victim, "P.S.", and arranged a drug deal for $60 worth of heroin later that morning.  (*Id.* ¶ 33.)  According to P.S.'s fiancée, she accompanied P.S. to pick up the drugs from Dunigan near the same location "Jessica" had done so earlier that day.  (*Id.* ¶ 35.)  She told investigators that once they got home, P.S. took some of the heroin he had purchased and that when she woke up, he was unresponsive.  A toxicologist determined that fentanyl ingestion was the cause of death.  (*Id.* ¶ 37.)

Later that morning, Dunigan arranged another drug deal with another client.  MSP moved to intercept during the deal and brought him into custody.  (*Id.* ¶ 38.)  While in jail, Dunigan called Edmonds, his co-defendant, and instructed him to take over the drug-dealing operation, which included picking up his drugs, paraphernalia, and cell phone located in Edmonds's house.  (*Id.* ¶¶ 42-44.)  Dunigan also spoke to Davis and was recorded orchestrating a drug deal between Davis and a former client.  (*Id.* ¶ 47.)

Though Dunigan was indicted on seven felony counts, he ultimately pled guilty to only one, the distribution of a mixture of substance containing fentanyl resulting in death, in violation of 21 U.S.C. § 841(a)(1) and (b)(2)(C).  The Government dismissed all other charges, including Count 5 of the indictment, charging him with conspiracy to distribute heroin and fentanyl.  (Plea Agreement ¶ 7, ECF No. 134.)  Additionally, as part of the plea, Dunigan stipulated to the following facts,

> On January 14, 2020, in Kalamazoo County, the Defendant knowingly and intentionally distributed to P.S. a mixture and substance that the Defendant knew

3

> was a controlled substance, knowing that P.S. intended to ingest it. The controlled substance the Defendant distributed to P.S. contained a detectable amount of fentanyl. P.S. ingested the fentanyl, which resulted in P.S.'s death. P.S.'s ingestion or use of fentanyl provided by the Defendant was the "but for" cause of P.S.'s death.

(Plea Agreement ¶ 6.)

Dunigan was sentenced to 320 months in prison, within the 300-420 month proposed guideline range. (Sentencing Judgment 2, ECF No. 187.) He appealed his sentence to the Sixth Circuit. After reviewing his potential claims, his court-appointed appellate counsel submitted an *Anders* brief to the court. Finding no basis for a challenge to the legality or reasonableness of Dunigan's sentence his counsel concluded that, "the conviction and sentence were both lawfully entered in this case." Br. for Appellant 9, *United States v. Dunigan*, No. 21-1549, slip op. (6th Cir. Dec. 20, 2021) ECF No. 35.

The Sixth Circuit accepted Dunigan's counsel's motion to withdraw and affirmed the Court's judgment agreeing that "there [was] no arguable basis for challenging the validity of Dunigan's guilty plea." *United States v. Dunigan*, No. 21-1549 at 3 (6th Cir. May 18, 2022). The court further found that "[t]he district court substantially complied with Rule 11's requirements in conducting Dunigan's plea colloquy," and that Dunigan knowingly and voluntarily waived his right to appeal his sentence and conviction. *Id*. at 4-6.

## II. LEGAL STANDARD

A prisoner may move to vacate his sentence under 28 U.S.C. § 2255 if he can demonstrate that the sentence was imposed in violation of the constitution or laws of the United States, that the court lacked jurisdiction to impose such a sentence, that the sentence was in excess of the maximum authorized by law, or that it "is otherwise subject to collateral attack." 28 U.S.C. § 2255. However, "Section 2255 does not provide relief for just any alleged error." *Bullard v. United States*, 937 F.3d 654, 658 (6th Cir. 2019). To prevail on a § 2255 motion, "a petitioner must

demonstrate the existence of an error of constitutional magnitude which had a substantial injurious effect or influence on the guilty plea or the jury's verdict." *Humphress v. United States*, 398 F.3d 855, 858 (6th Cir. 2005) (quoting *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 622 (1998) (quoting *Murray v. Carrier*, 477 U.S. 478, 485 (1986)).

One way a movant can demonstrate a constitutional error is by showing they received constitutionally inadequate representation. Under the *Strickland* standard for ineffective assistance of counsel, the movant must show two things. First, "that the attorney's performance fell below 'prevailing professional norms.'" *Monea v. United States*, 914 F.3d 414, 419 (6th Cir. 2019) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986)). "And second, that the attorney's poor performance prejudiced the defendant's case." *Id*. Prejudice is a high bar to clear. *Id*. at 419. The movant must demonstrate that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id*. (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011)). There are "[n]o particular set of detailed rules" that courts can compare to counsel's conduct to determine whether their representation fell below a minimum standard. *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984). Rather, courts must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case[.]" *Id*. at 690.

### III. ANALYSIS

Dunigan now challenges his conviction and sentence on three primary grounds. First, that the "death results" enhancement to his conviction was not properly found by a jury and therefore was unconstitutionally applied to him. Second, that the Court did not provide him with a sufficient

5

Rule 11 plea colloquy by failing to explain the term "conspiracy" as it applied to his sentence. Finally, that a crucial search warrant executed in his case was not supported by probable cause. He also claims that he did not raise these issues on appeal because his counsel's performance was constitutionally deficient.

### A. Death-Results Enhancement

Dunigan asks the Court to vacate his sentence because an element of a crime he was charged with was not found by a jury as required by the constitution *at trial*. *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000). Specifically, the element that the fentanyl Dunigan sold to P.S. was the "but-for" cause of P.S.'s death. *See Burrage v. United States*, 571 U.S. 204, 218 (2014) (holding that a defendant cannot be liable under 21 U.S.C. § 841 (b)(1)(C) unless the use of the drug distributed by the defendant is the "but-for" cause of the victim's death).

In *Alleyne v. United States*, 570 U.S. 99 (2013) the Supreme Court held that "any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to a jury and found beyond a reasonable doubt." *Id*. at 103. Here, Dunigan's minimum sentence was higher because he sold the drugs that caused P.S.'s death, therefore, the death-results prong of his conviction is an "element" of the crime that must be subjected to the same standards of proof as the actual sale or substance sold. However, when a defendant pleads guilty to a charged offense and admits to the facts necessary to sustain such a charge, they forgo the right to have each element submitted to a jury. *See United States v. Johnson*, 732 F.3d 577, 583-84 (6th Cir. 2013) ("We have recognized that *Alleyne's* extension of *Apprendi* to facts that increase a minimum statutory sentence left undisturbed our decisions holding that a defendant's knowing admission of the facts necessary for an enhanced sentence is fatal to his *Apprendi* claim.") In other words, Dunigan's guilty plea is the constitutional equivalent of a jury verdict. As part of that plea, Dunigan admitted that "P.S.'s

6

ingestion or use of fentanyl provided by the Defendant was the 'but for' cause of P.S.'s death. (Plea Agreement ¶ 6.)  As a result, Dunigan has not made out a constitutional error.

Further, Dunigan's assertion that the Court never explained that he had given up this right is belied by the record.  At his plea hearing, the Court instructed him that he was specifically pleading to the distribution of fentanyl resulting in death, and that this meant "the individual would not have died but for the use of fentanyl distributed by [him]" and that those elements would have to be proven were he to proceed to trial.  (Plea Hr'g Tr. 19, ECF No. 203.)  Dunigan responded that he understood.  (*Id*. at 20.)  The Court also explained that by pleading guilty he was giving up his right to a jury trial and waiving his right to have a jury establish his guilt.  (*Id*. at 26.)  Dunigan again said he understood.  (*Id*.)

### B. Conspiracy

Next, Dunigan challenges the sufficiency of the Court's Rule 11 colloquy, arguing that it was constitutionally insufficient because the definition of "conspiracy" as it applied to his charged conduct was never explained to him.  Dunigan pled guilty and was sentenced only based on Count 6 of the superseding indictment, the distribution of a mixture of substance containing fentanyl resulting in death in violation of 21 U.S.C. § 841(a)(1) and (b)(2)(C).  Count 5, conspiracy to distribute and possess with intent to distribute fentanyl and heroin, was dismissed pursuant to Dunigan's plea agreement with the Government.  (*See* Sentencing Judgment 1.)  As a result, Dunigan cannot make out a constitutional error here because he was never convicted of a conspiracy offense, meaning the definition of "conspiracy" was irrelevant to his guilty plea.

### C. Probable Cause

Finally, Dunigan claims that the search warrant executed on his niece's home which produced evidence of his drug activity was not supported by probable cause.

7

In some circumstances, evidence must be excluded from use *at trial* when it is obtained in violation of the Fourth Amendment.  For example, the Fourth Amendment requires that an affidavit to a warrant "describe the relationship of the person to the premises." *United States v. Savoca*, 761 F.2d 292, 297 & n.8 (6th Cir. 1985).  In other words, there must be a nexus between the place to be searched and the person the search is directed at.  While a violation of this rule may trigger the exclusionary rule, the rule "should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (quoting *United States v. Leon*, 468 U.S.468 U.S. 897, 905 (1984)).

Relying on *United States v. Van Shutters*, 163 F.3d 331 (6th Cir. 1998), Dunigan argues that there was no "nexus" between the place to be searched and the evidence sought.  *Id*. at 338; (Def's Mot. 7, ECF No. 221.)   Although *Van Shutters* discusses the "nexus" requirement, it is not particularly helpful to Dunigan.  The court in *Van Shutters* – on direct appeal – did find that one of the challenged search warrants in that case may have insufficiently stated a nexus between the place to be searched and the target of the investigation.  However, without specifically ruling one way or the other, the court found that even if there were not probable cause to support the warrant executed against Van Shutters, the good-faith exception to the exclusionary rule would have rendered the search constitutional.  *Van Shutters*, 163 F.3d at 338.  Dunigan does not offer any reason why that would not be true here too.

However, it is not necessary to determine whether MSP lacked probable cause to secure the search warrant or whether the good-faith exception applies because Dunigan waived his right to challenge the constitutionality of events that took place before his guilty plea. Generally, when a defendant voluntarily and unconditionally pleads guilty, "he may not thereafter raise independent

8

claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). After the entry of a guilty plea, federal habeas corpus review is limited to "the nature of the advice [given by trial counsel] and the voluntariness of the plea, not the existence of an antecedent constitutional infirmity. *Id*. at 266. In the plea agreement Dunigan entered into with the government, he explicitly agreed to waive "all rights to appeal or collaterally attack [] the conviction, sentence or any other matter relating to this prosecution." (Plea Agreement ¶ 12.) The agreement stipulated to several exceptions, 1) that the sentence exceeded the statutory maximum, 2) that the sentence was based on unconstitutional factors such as race, religion, national origin, or gender, 3) that the guilty plea was involuntary or unknowing, and 4) that an attorney provided constitutionally deficient assistance of counsel. (*Id*.)

Since none of the other exceptions are implicated here, the only way that Dunigan can challenge the constitutionality of this search as it related to his conviction is by showing that his guilty plea was somehow invalid. He does not meet this burden. Indeed, he does not challenge the validity of his guilty plea at all. Even if he did, the record clearly shows that Dunigan knowingly and voluntarily entered into the agreement. During his plea colloquy, the Court expressly went over each term of the plea agreement with Dunigan, and he indicated that he understood and agreed to their contents. Specifically, the Court asked Dunigan if he was aware that "you're waiving your right to appeal or collaterally attack the conviction or sentence," with the few limited exceptions. (Plea Hr'g Tr. 34.) To which Dunigan replied that he was. (*Id*.) Dunigan's counsel also stated that he "either read word-for-word or summarized each paragraph of the plea agreement, and [he] believe[d] that Mr. Dunigan fully underst[ood] each paragraph." (*Id*.)

**D. Ineffective Assistance of Counsel**

Though Dunigan does not raise it as a separate ground for this motion, he alleges that his appellate counsel was ineffective for failing to raise the previously discussed issues in his direct appeal. To state a valid claim for ineffective assistance of appellate counsel, Dunigan must show that 1) his counsel's performance was constitutionally deficient, and 2) he was prejudiced as a result. *Monea*, 914 F.3d at 419. Since the failure to show either prong is fatal to such a claim, "[i]f it is easier to dispose of [the claim] on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

Here, all three of Dunigan's claims fail because even if he could show his counsel's performance was deficient, he is unable to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Davis*, 658 F.3d at 536.

As previously discussed, neither Dunigan's challenge to his sentencing nor the sufficiency of the Court's plea colloquy has merit. By pleading guilty, Dunigan gave up the right to have each element of the crime he was sentenced to proven to a jury beyond a reasonable doubt. Therefore, had his appellate counsel raised that issue on direct appeal, it would have had no effect on the outcome. Likewise, had Dunigan's appellate attorney raised the issue of the definition of "conspiracy" on direct appeal, it would have had no effect on those proceedings because Dunigan was not convicted of a conspiracy offense. Finally, Dunigan's counsel would have been equally unsuccessful arguing that the search warrant executed on Dunigan's niece's house was not supported by probable cause because Dunigan waived his right to "appeal or collaterally attack [his] [] conviction, sentence or any other matter relating to [his] prosecution" when he pled guilty. (Plea Agreement ¶ 12.) Therefore, it would have been inappropriate for his appellate counsel to nevertheless raise that argument, and it would have failed.

10

## IV. CONCLUSION

For the reasons stated above, Dunigan's § 2255 motion will be denied. The Court will enter an order consistent with this Opinion.

Dated: January 19, 2024           /s/ Hala Y. Jarbou
                                  HALA Y. JARBOU
                                  CHIEF UNITED STATES DISTRICT JUDGE